#24178-rev & rem-JKM

**2007 SD 95**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

BERNARD M. EITE,                                    Claimant and Appellant,

v.

RAPID CITY AREA SCHOOL
DISTRICT 51-4,                                      Employer and Appellee,

and

ASSOCIATED SCHOOL BOARDS OF
SOUTH DAKOTA WORKERS
COMPENSATION TRUST FUND,                           Provider and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JANINE M. KERN
Judge

* * * *

JAMES D. LEACH                                     Attorney for claimant
Rapid City, South Dakota                           and appellant.

NAOMI R. CROMWELL of
Tieszen Law Office, LLC
Pierre, South Dakota                               Attorney for appellees.

* * * *

CONSIDERED ON BRIEFS
ON FEBRUARY 13, 2007

OPINION FILED **09/05/07**

#24178

MEIERHENRY, Justice

[¶1.]    Bernard Eite (Eite) filed a petition for workers' compensation benefits after he suffered his third back injury while working as a custodian for the Rapid City School District (the District). After extensive expert testimony, the Department of Labor denied Eite's petition for permanent and total disability benefits under the odd-lot doctrine. Eite appeals and we reverse.

**FACTS**

[¶2.]    Eite is fifty-eight years old and came to the Rapid City area from England in 1985. Eite received his education in England during the 1950's. Eite stated that he "finished" school at age fifteen although he could not say that his education level equated to having a high school diploma. Eite has difficulty reading and writing and has an IQ of 80.[1] Upon arriving in Rapid City, he worked as a dump truck driver and a limousine driver. In 1989, he began working for the District as a custodian.

[¶3.]    During his employment with the District, Eite suffered three separate back injuries. The first occurred in 1993 when Eite fell on the ice while taking some garbage out to the trash bin. Eite was prescribed pain medication and bed rest and eventually returned to work with the District. The second injury occurred in 1996 when Eite was lifting a box of bleach. Although Eite returned to work, his back pain worsened and he began seeing neurosurgeon Dr. Larry Teuber in 1999.

---

1.    Eite testified that he has hidden his inability to read and write from everyone but his wife. Eite further testified that when he is asked to read anything, he uses his lack of eyeglasses as an excuse.

[¶4.]     Under Dr. Tueber's advice, Eite underwent an operation commonly known as an L4-5 fusion[2] and began physical therapy with Dr. Brett Lawlor. Because Eite was restricted from lifting anything over forty-five pounds, he was unable to return to his position as custodian. Consequently, the District offered Eite a job as an Instructional Assistant,[3] which Eite accepted. However, due to Eite's limited ability to read and write, he struggled in this position. Eite subsequently spoke with Dr. Lawlor about returning to work as a custodian. Dr. Lawlor agreed that Eite could return to work without any lifting restrictions. Eite resumed his position as custodian. At this time, Dr. Lawlor noted that Eite was at a 10% permanent impairment rating.

[¶5.]     Eite's third back injury occurred in February of 2001 when Eite fell on the ice while working as a custodian. Eite was restricted from working and began physical therapy. After he failed to see any improvement, Eite accepted the District's offer to return to work as an Instructional Assistant/Tutor/Noon Duty. Once again, Eite experienced difficulty because he was unable to help students with their work because of his inability to read or write at a sufficient level.

[¶6.]     Eite's back pain did not improve and he returned to Dr. Teuber. The District subsequently placed Eite on a leave of absence. In October of 2001, Dr.

---

2.   This surgery consisted of the following: an L4-5 anterior lumbar interbody arthodesis, with insertion of an interdiscal prosthetic tricortical threaded dowel, and harvesting of the right anterior iliac bone crest graft through a separate incision for spinal arthrodesis.

3.   The District's position description for Instructional Assistant described the basic function of the position as follows: "To actively assist the classroom education teacher in all facets of the instructional process." The job responsibilities included: "To assist with the basic skills needs of assigned students in cooperation with the classroom teacher."

Teuber performed a second surgery on Eite's back, wherein a permanent metal device resembling an old-fashioned two-support football goalpost with a crossbar was implanted in Eite's spine at S-1 to L-5 to L-4.[4] As a result of this lower level fusion, Dr. Lawlor restricted Eite to lifting twenty pounds. During the first three months after this surgery, Eite's back pain persisted. Despite Eite's participation in physical therapy from January to March of 2002, his pain levels remained the same.

[¶7.] In August of 2002, Eite completed his first functional capacities examination (FCE) with physical therapist Myron Sorestad. Sorestad concluded that Eite could work at the "light" level of work as defined by the U.S. Department of Labor Dictionary of Occupational Titles.[5] Accordingly, Eite could not lift more than twenty pounds. Sorestad observed that Eite self-limited his participation in sixteen of the twenty-one tasks. Sorestad noted that self-limitation was common when participants feared re-injury; experienced pain, anxiety, depression; lacked familiarity with a safe physical maximum; or lacked motivation to perform maximally because of financial consequences. Sorestad noted that self-limitation was common under a variety of circumstances. He reported that patients may self-

---

4. The second surgery consisted of the following: laminectomy and foraminotomy facetectomy of the bilateral L4 nerve roots; laminectomy, foraminotomy, lateral recess decompression of the L5 nerve root; laminectomy foraminotomy of the S1 nerve roots; transpedicle screw instrumentation at L4-S1 with Texas Scottish Rite trans pedicle screw fixation; arthodesis posterior onlay transverse process utilizing autograft at L4-5 bilaterally; and a posterior lumber interbody arthodesis of the L5-S1 segment utilizing the autograft and allograft.

5. Dr. Lawlor released Eite to work within the guidelines of the FCE but limited his lifting. Additionally, Dr. Lawlor required Eite to take frequent breaks with no more than 60 minutes of continuous sitting, standing, walking, or bending.

limit because they fear re-injury, or because they are experiencing pain, depression or anxiety. Self-limitations may also be caused by the patient's unfamiliarity with the maximum amount of activity and movement they may safely do without pain or reinjury, or because the patient lacks the motivation to perform to their maximum ability because they believe they will lose financial benefits. Eite reported that he limited his participation because of increased low back pain and fear of further injury.

[¶8.] Eite was subsequently evaluated by Dr. Lawlor. Dr. Lawlor noted that Eite presented no volitional movement with forward flexion, side bending, extension or extension rotation. Dr. Lawlor prescribed the following limitations and restrictions: "Change position from sit to stand to walk every half hour as necessary. Limit bending and twisting, lifting, walking, crawling, climbing a ladder, and squatting to occasional; maximum lift of 20 pounds." Eite was restricted to the light work category.

[¶9.] Later in 2002, Eite met with psychologist Bobbi Kramlich at the request of the Social Security Administration. Kramlich noted that although Eite had difficulty with number reversals, he still had the intellectual capacity to effectively manage his Social Security benefits. At this time, Eite informed Kramlich that he had "become more depressed just before Christmas when he was informed that workers' comp was finished and that he was expected to get a job."

[¶10.] Eite met with Rick Ostrander, a vocational rehabilitation counselor, to obtain assistance with his job search. After meeting with Eite, Ostrander realized Eite had limited intellectual functioning so he referred him to Dr. Curt Hill for a

psychological and intellectual assessment. The results of Eite's intelligence testing indicated that he had a verbal IQ of 79, a performance IQ of 86, and a full scale IQ of 80, which placed him in the borderline level of intellectual functioning. Eite's aptitude testing indicated Eite had a first grade reading level and a fourth grade spelling level. Additionally, Dr. Hill diagnosed Eite as having major depressive disorder, recurrent, of moderate severity.

[¶11.] Ostrander also administered a Transferable Skills Analysis to evaluate what type of work might be available to Eite within the Rapid City labor market. Considering Eite's twenty pound lifting restriction, his age, his previous back injuries,[6] his intellectual functioning, and his depression, Ostrander concluded that there were very few opportunities for employment for Eite and a job search would be futile. Nevertheless, Ostrander was able to identify a few possible job opportunities, which included work as a taxi driver, courier, messenger or parking lot attendant. However, after contacting such employers, he discovered the positions required Eite to lift more than twenty pounds or paid at a level below Eite's workers' compensation rate. Consequently, Ostrander concluded that Eite was not employable within the Rapid City labor market at or above his workers' compensation benefit rate. Furthermore, Ostrander concluded that Eite would not benefit from vocational rehabilitation and that such training was not feasible.

[¶12.] Despite Ostrander's conclusion that Eite was not employable within his labor market, Eite and his attorney continued searching for suitable

---

6. Ostrander testified that a study in the Journal of Private Sector Rehabilitation found that 99 out of 100 employers admitted to being biased against hiring someone with a back injury.

employment. Eite checked on job listings at the One Stop Career Center a couple of times per week and read the Rapid City Journal classifieds regularly. Eite followed up on several job leads and kept a written log of his job search. However, Eite failed to find any open positions to apply for that would accommodate his lifting restrictions or that met his workers' compensation rate. Eite also applied for rehabilitation services from the South Dakota Division of Rehabilitation Services and purchased a security guard license, but he was still unable to obtain employment.

[¶13.]     Eite also met with Bruce Rogers, a vocational rehabilitation counselor, for job search information. After meeting with Eite, Rogers concluded that a work search would not be futile and provided Eite with twenty-six job leads. Rogers noted that Eite followed up on all of the job leads he was provided but failed to submit an application for positions that had been filled. Rogers felt that Eite should have submitted an application regardless of whether the position was filled in order to be considered for possible future openings. Consequently, he labeled Eite's job search as one of the poorest he had ever seen.

[¶14.]     Eite was also asked to submit to an independent medical exam (IME). Dr. Anderson facilitated the IME and noted that Eite reported that he had difficulty carrying on any sustained activity besides lying down for more than one-half hour at a time. Eite demonstrated a five degree flex motion and a zero degree extension. Dr. Anderson described Eite's range of motion as an "incredible restriction." Dr. Anderson restricted Eite to work at a light work category, with twenty pounds maximum lifting and ten pounds frequent lifting.

[¶15.] In 2003, physical therapist Nano Johnson administered Eite's second FCE. She noted that when asked to bend from his waist, Eite moved forward only three degrees and back only four degrees, causing Johnson to opine that Eite's range of motion was "out of the realm" of anything she had ever seen. Eite also refused to squat, stating that he was afraid he would injure his back. However, when Johnson incorporated squatting and bending at the waist into other activities, Eite did a full squat several times and bent at the waist significantly more than he had previously demonstrated. Therefore, Johnson concluded that Eite was "trying to demonstrate some weakness that wasn't there" and concluded that the FCE was invalid.

[¶16.] Eite filed a petition for workers' compensation benefits in January of 2003.[7] At the hearing, both parties presented extensive expert testimony. Vocational counselor Rogers testified for the District. Rogers identified fourteen prospective employers who indicated they would be willing to modify the job requirements to meet Eite's limitations. However, Rogers failed to disclose to these employers any of Eite's limitations, including the twenty pound lifting restriction.

[¶17.] The Department concluded that Eite failed in his ultimate burden of persuasion because he misrepresented his physical capabilities to his medical providers, because of the lack of objective medical evidence to support his assertions

---

7. The parties stipulated that Eite sustained an injury arising out of and in the course of his employment in 2001; that Eite had prior work-related compensable back injuries in 1993 and 1996; and that those pre-existing injuries contributed independently to Eite's current disability, impairment, or need for treatment.

of total disability, and because of his lack of credibility at the hearing.[8] The Department's credibility determinations stemmed from a surveillance video made by a private investigator hired by the District. In one particular portion of the video, Eite is shown camping and boating over a four day period with his family in August of 2003. During this time, Eite climbs in and out of his fishing boat, lifts a trolling motor, helps his son lift a picnic table, and exits the boat on a steep shoreline to untangle his granddaughter's fishing line from a fallen tree. Eite's relatively normal, fluid motion in the video conflicted with the pain behavior he demonstrated to his medical providers.

[¶18.] At the hearing, Eite's increased mobility in the surveillance video was noted by expert witnesses on both sides. All of the experts agreed there were significant differences in the surveillance video and the way Eite presented at his medical appointments; nevertheless, the experts agreed that Eite's two-level fusion required physical limitations and restrictions. Dr. Lawlor testified that Eite's two-level fusion made him prone to accelerated degeneration of the joint or disc, which would cause increased pain and potential disc herniation. Dr. Lawlor maintained that Eite should be limited to light duty work with lifting restrictions of twenty pounds. He liberalized Eite's restriction on bending, twisting, and crawling from occasional to more frequent and the necessity of changing positions from every one-half hour to every forty-five minutes as necessary.

[¶19.] The Department accepted Dr. Lawlor's testimony regarding Eite's physical restrictions in its findings, stating, "Based upon the expert medical

8. The Department also rejected District's expert testimony suggesting that Eite was a malingerer.

evidence, Claimant is physically capable of working at least at a light duty, full time level with a lifting limit of 20 pounds and position changes every 45 minutes." Nevertheless, the Department concluded that Eite "failed in his burden of production and in his burden of persuasion." Specifically, the Department found that Eite "failed to conduct a reasonable, good faith work search." Alternatively, the Department stated that if Eite met his burden of production, the District met its burden to demonstrate the regular and continuous availability of suitable work in Eite's community. Eite appeals and raises the following issues:

## ISSUES

1. Whether the circuit court erred in affirming the Department's finding that Bernard Eite did not show a prima facie case under the odd-lot doctrine.
2. Whether the circuit court erred when it affirmed the Department's failure to find the District's vocational expert's testimony inadequate as a matter of law because the vocational expert did not tell any prospective employers about Eite's limitations.
3. Whether the circuit court erred when it affirmed the Department's finding that Eite did not carry his burden of proof under the odd-lot doctrine.

## STANDARD OF REVIEW

[¶20.] When reviewing an administrative agency's decision, this Court's standard of review is well settled and governed by SDCL 1-26-37, which provides that on review we "'shall give the same deference to the findings of fact, conclusions of law, and final judgment of the circuit court as it does to other appeals from the circuit court.'" Wise v. Brooks Const. Services, 2006 SD 80, ¶16, 721 NW2d 461, 466 (quoting Holscher v. Valley Queen Cheese Factory, 2006 SD 35, ¶28, 713 NW2d 555, 564). "The Department's factual findings and credibility determinations are reviewed under the clearly erroneous standard." Id. (additional citations omitted).

These findings will only be reversed "if we are definitely and firmly convinced a mistake has been made." *Id.* (Kuhle v. Lecy Chiropractic, 2006 SD 16, ¶16, 711 NW2d 244, 247). "'[F]indings based on deposition testimony and documentary evidence are reviewed under the de novo standard of review.'" *Id.* (quoting *Holscher,* 2006 SD 35, ¶29, 713 NW2d at 564). "Questions of law are reviewed *de novo.* Mixed questions of law and fact are also fully reviewable." *Id.* (internal citations and quotations omitted). The burden is ultimately on the claimant to prove all facts essential to compensation. *Id.* (citing *Kuhle,* 2006 SD 16, ¶15, 711 NW2d at 247).

## ANALYSIS

[¶21.] "'Whether a claimant is entitled to odd-lot disability benefits is a question of fact subject to review under the clearly erroneous standard.'" *Wise,* 2006 SD 80, ¶27, 721 NW2d at 470-71 (quoting Kassube v. Dakota Logging, 2005 SD 102, ¶34, 705 NW2d 461, 467). SDCL 62-4-53 governs whether a person is totally and permanently disabled and provides in part:

> An employee is permanently totally disabled if the employee's physical condition, in combination with the employee's age, training, and experience and the type of work available in the employee's community, cause the employee to be unable to secure anything more than sporadic employment resulting in an insubstantial income. An employee has the burden of proof to make a prima facie showing of permanent total disability. The burden then shifts to the employer to show that some form of suitable work is regularly and continuously available to the employee in the community. The employer may meet this burden by showing that a position is available which is not sporadic employment resulting in an insubstantial income as defined in subdivision 62-4-52(2). An employee shall introduce evidence of a reasonable, good faith work search effort unless the medical or vocational findings show such efforts would be futile. The effort to seek employment is not reasonable if the

> employee places undue limitations on the kind of work the employee will accept or purposefully leaves the labor market. An employee shall introduce expert opinion evidence that the employee is unable to benefit from vocational rehabilitation or that the same is not feasible.

Pursuant to SDCL 62-4-53, there are two ways Eite could make a prima facie showing that he is entitled to benefits under the odd-lot category.

> First, if the claimant is obviously unemployable, then the burden of production shifts to the employer to show that some suitable employment within claimant's limitations is actually available in the community. A claimant may show obvious unemployability by: 1) showing that his physical condition, coupled with his education, training, and age make it obvious that he is in the odd-lot total disability category, or 2) persuading the trier of fact that he is in the kind of continuous severe and debilitating pain which he claims.
>
> Second, if the claimant's medical impairment is so limited or specialized in nature that he is not obviously unemployable or regulated to the odd-lot category, then the burden remains with the claimant to demonstrate the unavailability of suitable employment by showing that he has made reasonable efforts to find work and was unsuccessful. If the claimant makes a prima facie showing based on the second avenue of recovery, the burden shifts to the employer to show that some form of suitable work is regularly and continuously available to the claimant. *Even though the burden of production may shift to the employer, however, the ultimate burden of persuasion remains with the claimant.*

*Wise,* 2006 SD 80, ¶28, 721 NW2d at 471 (quoting Sandner v. Minnehaha County, 2002 SD 123, ¶10, 652 NW2d 778, 783) (emphasis in original).

> 1. *Whether Eite made a prima facie showing that he was entitled to benefits under the odd-lot doctrine*

[¶22.]     Eite argues that the Department erred when it concluded that Eite failed to make a prima facie showing that he was entitled to benefits under the odd-lot doctrine. Specifically, Eite limits his challenge to whether he demonstrated the unavailability of suitable employment by showing that he had made reasonable

efforts to find work and was unsuccessful.[9]  "The effort to seek employment is not reasonable if the employee places undue limitations on the kind of work the employee will accept or purposefully leaves the labor market."  SDCL 62-4-53.  The Department concluded that Eite's job search was not reasonable because he misrepresented his pain to medical providers and because of Rogers' testimony that Eite's job search was unreasonable.

[¶23.]    "The test to determine whether a prima facie case has been established is whether there 'are facts in evidence which if unanswered would justify persons of ordinary reason and fairness in affirming the question which the plaintiff is bound to maintain.'"  Sandner v. Minnehaha County, 2002 SD 123, ¶13, 652 NW2d 778, 783.  The facts regarding Eite's job search included regularly checking with the

---

9.    The Department made findings on every element in SDCL 62-4-53.  The findings were as follows:

    7. Claimant failed to demonstrate "obvious unemployability" as defined by the "odd-lot" doctrine.

    8. Claimant failed to show that his physical condition, in combination with his age, training, and experience and the type of work available in his community, cause him to be unable to secure anything more than sporadic employment resulting in an insubstantial income.

    9. Although the burden of production did not shift to Employer/Provider, Employer/Provider met its burden showing that some form of suitable work is regularly and continuously available to Claimant in his community by showing insubstantial income as defined in SDCL 62-4-52(2).

    10. The medical and vocational findings do show that a work search would not be futile for Claimant and could return Claimant to suitable, substantial and gainful employment.

    11. Claimant's job search was not a good faith, reasonable work search.

    12. Claimant failed to demonstrate that vocational rehabilitation is not feasible solution to his alleged inability to find employment.

Career Center, regularly reading the Rapid City Journal, following up on job leads provided by Bruce Rogers, undergoing testing at the One Stop Career Center, applying for Rehabilitation Services from the South Dakota Division of Rehabilitation Services, and purchasing a private security guard license. Such steps, if unanswered, would justify a person of ordinary reason and fairness in concluding that Eite's efforts to seek employment were reasonable.

[¶24.]		This is not a case where a claimant failed to follow up on job leads and ignored the advice of vocational counselors. *Cf. Sandner*, 2002 SD 123, ¶26, 652 NW2d at 785 (claimant failed to show reasonable efforts to find employment when he did not follow up on 32 of 95 job leads); Wagaman v. Sioux Falls Const., 1998 SD 27, 576 NW2d 237 (noting that claimant's one attempt to reenter work force did not constitute a reasonable effort). Rather, this is a case where the claimant followed up on every job lead he was given. This fact was supported by Rogers, the District's vocational expert, who admitted that Eite followed up on all twenty-six of the job leads he supplied to Eite. Specifically, Rogers testified, "I'm not – I'm not contesting anything with [Eite's attorney] about his following up. He did follow up on things. He did make phone calls. He did go out." However, Rogers labeled Eite's job search efforts as "poor" because of Eite's failure to submit applications to employers where the position had been filled in order to be considered for possible future employment. Eite was required to introduce evidence of "a reasonable, good faith work search effort." SDCL 62-4-53. This omission does not make Eite's job search unreasonable. *See* Capital Motors, LLC v. Schied, 2003 SD 33, ¶12, 660 NW2d 242, 247 (stating that employer must show more than mere possibility of employment).

[¶25.] Nevertheless, the District argues that we must give deference to the Department's determination that Eite did not complete a good faith job search because it was based on Eite's lack of credibility. However, the Department did not base its credibility determination on a finding that Eite was a malingerer or that he had lied about his job search efforts. Rather, the Department emphasized Eite's lack of credibility in terms of his subjective pain experience and mobility. Even though the Department questioned Eite's credibility as to pain and mobility, it recognized that he had certain physical limitations including a twenty-pound lifting restriction. Eite's evidence showed that his job search and vocational counseling were based on those physical limitations. Therefore, Eite's exaggerated pain and feigned lack of mobility were not a factor in his job search. Accordingly, Eite established a prima facie case and the burden shifted to the District to show that some form of suitable work was regularly and continuously available to the claimant. *See Wise*, 2006 SD 80, ¶29, 721 NW2d at 472; SDCL 62-4-53.

> 2. *Whether the District met its burden of showing that suitable work was regularly and continuously available in the community.*

[¶26.] The Department concluded that the District met its burden to show that some form of suitable work was regularly and continuously available to Eite within the Rapid City labor market which was not sporadic employment resulting in insubstantial income. After Eite made a prima facia showing of odd-lot permanent total disability

> [t]he burden then shift[ed] to the employer to show that some form of suitable work is regularly and continuously available to the employee in the community. The employer may meet this burden by showing that a position is available which is not sporadic employment resulting in an insubstantial income as defined in subdivision 62-4-52(2).

SDCL 62-4-53. The District presented the testimony of vocational counselor Rogers in an attempt to meet this burden. Rogers testified that he provided Eite with several job leads that he felt would accommodate Eite's restrictions. However, Rogers testified that he did not inform any of the employers he contacted about Eite's twenty-pound lifting restriction, his previous back injury, his age, his reading and writing limitations, or his doctor's recommendation that he switch positions every forty-five minutes. Consequently, Eite argues that Rogers' testimony is inadequate as a matter of law because the District was required to show the existence of "'specific' positions 'regularly and continuously available' and actually open in 'the community where the claimant is already residing' for persons with *all* of claimant's limitations." Stang v. Meade School Dist. 46-1, 526 NW2d 496, 499 (SD 1995) (quoting Shepherd v. Moorman Mfg., 467 NW2d 916, 920 (SD 1991) (emphasis in original)).

[¶27.] Based on Rogers' testimony, the Department concluded that the District demonstrated that there were positions open within the community that would accommodate Eite's physical limitations. Although in a battle of experts, we usually defer to the Department's finding, omitting such significant pieces of information regarding a claimant's abilities has led this Court to discount a vocational rehabilitation counselor's testimony in prior cases. *See* Kurtz v. SCI, 1998 SD 37, ¶21 n6, 576 NW2d 878, 885 n6 (stating that it was significant that counselor failed to inform prospective employers about claimant's physical limitations when he inquired into available jobs); Rank v. Lindblom, 459 NW2d 247, 250 n1 (SD 1990) (noting that counselor left out significant pieces of information

regarding claimant's abilities). Therefore, the Department erred when it accepted Rogers' opinion that there were open and available positions within the Rapid City labor market that could accommodate Eite's physical limitations.

[¶28.] An expert's listing of jobs that focuses on a claimant's capabilities to the exclusion of his limitations is insufficient as a matter of law. When prospective employers were not informed of the nature of the limitations they needed to accommodate, there was no basis for the expert's opinion in concluding that the employers were willing to make modifications to meet those limitations. Therefore, the Department's acceptance of the job search, identifying fourteen prospective employers, based solely on Eite's capabilities to the exclusion of his limitations is an error of law. Accordingly, we reverse. Because the District failed to meet its burden as a matter of law, we need not consider the remaining issue of whether Eite carried his burden of proof under the odd-lot doctrine.

[¶29.] For the aforementioned reasons, we reverse and remand for entry of judgment consistent with this opinion.

[¶30.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.